FISONS LIMITED and Fisons Pharmaceuticals Ltd., Petitioners-Defendants,

v.

UNITED STATES of America, Respondent-Plaintiff.

Misc. No. 1235.

United States Court of Appeals, Seventh Circuit.

Jan. 5, 1972.

Certiorari Denied April 3, 1972. See 92 S.Ct. 1312.

Charles J. Merriam, Chicago, Ill., for petitioners-defendants.

Stephen Rubin, Chicago, Ill., for respondent-plaintiff.

Before PELL, STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

Three jurisdictional issues are presented by this appeal: (1) whether an interlocutory order in a civil antitrust case brought by the United States may be reviewed by a court of appeals pursuant to 28 U.S.C. § 1292(b); (2) if so, whether this is an appropriate case for the exercise of that jurisdiction; and (3) if that also be so, whether the district court acquired personal jurisdiction over petitioners as a result of service effected pursuant to § 17(1) (a) of the Illinois Civil Practice Act, Ill.Rev.Stat.1971, c. 110, § 17(1) (a). We answer all three questions in the affirmative.

Petitioners are two British corporations, one the wholly owned subsidiary of the other, each having its principal place of business in England. They manufacture iron dextran in Great Britain and sell it to certain large American companies. Iron dextran is a patented product used in the treatment of anemia and other iron deficiency conditions in humans and other animals. Petitioners own the American patent on iron dextran and have entered into license agreements which the Government claims are violative of the Sherman Act.

This litigation was commenced on July 23, 1969, when the Government filed its complaint pursuant to § 4 of the Sherman Act, 15 U.S.C. § 4, against five defendants, including the two petitioners and their three American licensees. It is alleged that trade in iron dextran has been unreasonably restrained since 1956 by the defendants' license agreements which allocate markets, restrict the resale of the product in bulk form, control the use of certain trademarks, require the licensees to assign all trademarks to petitioners when the agreements expire, and restrict the grant of additional licenses.

The jurisdictional requirement of § 17(1) (a) of the Illinois Civil Practice Act was allegedly satisfied by (1) the existence of the agreements, which affect the economy of Illinois; (2) the fact that all three licensees do business in Illinois; (3) the continual exportation of iron dextran from Britain for resale in Illinois; and (4) the fact that certain business relating to the agreements was transacted in Illinois by officers of petitioners and a predecessor in interest.

On August 21, 1969, petitioners filed a motion to quash service and to dismiss the complaint against them for lack of jurisdiction. The motion was supported by an affidavit in which the conclusory allegations in the complaint were denied, and except for three visits in 1968 and two in 1969, all direct contact between petitioners and the transaction of business in Illinois was specifically denied. The Government conducted extensive discovery on the jurisdictional issue, the matter was briefed extensively, and ultimately the district court overruled the motion to quash or to dismiss.

In his order entered on August 27, 1971, the district judge expressed the opinion that he had decided "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the Order may materially advance the ultimate termination of this litigation." He then stated the controlling question [1] and

1. "The controlling question of law presented is whether as of July 23, 1969, either British defendant Fisons Limited or Fisons Pharmaceuticals Ltd. was transacting business in Illinois sufficient to permit service under the long-arm statute § 17(1) (a) of the Illinois Civil Practice Act, where the only contact of these defendants with Illinois is as follows: (a) defendants are parties to a patent license agreement with a licensee found in Illinois, the agreement having been executed outside of Illinois; (b) defendants make and sell patented products to such patent licensee in England where title passes; and (c) defendants' officers have visited Illinois to discuss with such licensee said agreement and

ordered that further proceedings involving the two petitioners be stayed "until a final decision on any interlocutory appeal under 28 USC § 1292(b)."

■ Within the 10-day period specified in the statute petitioners sought permission from this court to take an appeal from that order.[2] The Government opposed the petition, contending that § 1292 (b) is not applicable to cases which are subject to the Expediting Act of 1903, 15 U.S.C. § 29, and in any event, since the decision of the district court was correct, there was no reason to allow a discretionary appeal.

On September 30, 1971, after noting the importance and novelty in this court of the question presented under § 1292 (b), we set the matter for oral argument, invited the parties to file additional memoranda, and directed that the district court proceedings not be stayed while the issues were under consideration here.

We now explain why we believe each jurisdictional question should be answered affirmatively.

## I.

The two statutes directly relevant to the first jurisdictional issue were enacted, respectively, in 1903 and 1958. The earlier is commonly known as the Expediting Act,[3] and the latter as the Interlocutory Appeals Act.

The Expediting Act applied to suits in equity brought under the Sherman Act, the Interstate Commerce Act, or any other act "having a like purpose" that might thereafter be enacted. Its first section authorized the Attorney General to file a certificate of importance in such cases, whereupon the matter would be heard by three judges and given precedence over other litigation "and in every way expedited." That procedure, though still authorized by 15 U.S.C. § 28, was not used in this case and has been employed rarely, if at all, in recent years.[4]

Section 2 of the Expediting Act drastically shortened the time for appeal in cases covered by the statute. Prior to its enactment in 1903, six months were allowed in which to take an appeal to the Circuit Court of Appeals, 26 Stat. 826, 829, and one year after the entry of that court's judgment, an appeal lay to the Supreme Court. 26 Stat. at 828. Section 2 provided:

"That in every suit in equity pending or hereafter brought in any circuit court of the United States under any of said Acts, wherein the United States is complainant, including cases submitted but not yet decided, an appeal from the final decree of the circuit court will lie only to the Supreme Court and must be taken within sixty days from the entry thereof. . . ."[5] 32 Stat. 823; 15 U.S.C. § 29.

possible future agreements, and to discuss with counsel in Illinois matters concerning a patent infringement suit filed in the Third Circuit."

2. By separate petition they also prayed for a writ of mandamus or prohibition. Because such relief in this court is only appropriate "in aid of" our own jurisdiction, see United States Alkali Export Association v. United States, 325 U.S. 196, 202, 65 S.Ct. 1120, 89 L.Ed. 1554; Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 25, 63 S.Ct. 938, 87 L.Ed. 1185, we held that it could not be granted unless we had jurisdiction pursuant to § 1292 (b), in which event the extraordinary relief would be unnecessary. We therefore denied the petition for a writ of mandamus or prohibition.

3. Its actual title was: "An Act To expedite the hearing and determination of suits in equity pending or hereafter brought under the Act of July second, eighteen hundred and ninety, entitled 'An Act to protect trade and commerce against unlawful restraints and monopolies,' 'An Act to regulate commerce,' approved February fourth, eighteen hundred and eighty-seven, or any other Acts having a like purpose that may be hereafter enacted." 32 Stat. 823.

4. See Proposed Amendment to Expediting Act Would Eliminate Direct Appeal to Supreme Court, 39 N.Y.U.L.Rev., 319, 325 n. 40 (1964).

5. The section also included a proviso relating to appeals taken before the effective date of the statute.

By its terms, § 2 of the Expediting Act applies to appeals from final decrees in a limited category of cases. The Interlocutory Appeals Act of 1958 makes no reference to final orders and its language is applicable to all civil litigation in the federal district courts. It provides:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 1292 of title 28 of the United States Code is hereby amended by insertion of the letter (a) at the beginning of the section and adding at the end thereof an additional subparagraph lettered (b) to read as follows:

" '(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.'

"Approved September 2, 1958." 72 Stat. 1770.

A plain reading of the two statutes reveals no inconsistency between them. If they had been enacted simultaneously, the language of each could be given full effect without limiting the scope of the other. If some conflict in literal meaning did exist, under normal rules of construction the later statute would prevail. United States v. Wrightwood Dairy Co., 127 F.2d 907, 912 (7th Cir. 1942); Eisenberg v. Corning, 86 U.S.App.D.C. 21, 179 F.2d 275, 276 (1949).

The purpose of the 1958 Act is consistent with the expediting purpose of the 1903 Act. Although it authorizes a departure from the general practice of postponing appellate review until after the entry of a final judgment, such authorization is only for the purpose of materially advancing the ultimate termination of the litigation. The specified procedure must be invoked within ten days and shall not stay proceedings in the trial court unless a judge shall expressly so direct.

The legislative history of the Interlocutory Appeals Act indicates that it was intended to apply to protracted cases, including antitrust litigation.[6] Indeed, it is fair to infer that its primary efficacy was expected to occur in cases of exceptional magnitude.[7] In sum, the plain lan-

---

6. We recognize that the examples of antitrust litigation referred to in the Senate Committee Report were apparently private cases and that no unambiguous reference to Government litigation appears. The many federal judges who participated in the consideration of the proposed legislation, however, were certainly familiar with appellate procedure in both private and Government antitrust litigation, whether civil or criminal.

7. Thus, a letter from the Administrative Office of the U.S. Courts appended to the Senate Committee Report stated that the interlocutory appeal procedure "will be used only in exceptional cases where a decision of the appeal may avoid pro-

tracted and expensive litigation, as in antitrust and similar protracted cases, . . . ." S.Rep. No. 2434 (85th Cong.2d Sess.) 1958 U.S.Code Cong. & Adm.News, pp. 5255, 5259.

The report itself contained language, which, with only slight changes, might have been written of the very case before us:

"For example, in a recent case a motion to dismiss for want of jurisdiction was filed in the district court early in the proceedings. The district court denied the motion and the matter then proceeded to trial. The disposition of that case took almost 8 months. Upon final order the case was appealed and the court of appeals determined that the district court did not have ju-

guage, the purpose, and the history of the Interlocutory Appeals Act of 1958 are all consistent with its application to civil antitrust litigation commenced by the United States.

The Government advances a number of arguments for a contrary interpretation. None of these arguments questions the wisdom of applying the 1958 Act to this type of case, or suggests any conflict between the language or the policy of the two statutes. In essence, it is the Government's position that the Expediting Act is an especially important statute which has been construed to mean a great deal more than it says, and specifically to foreclose interlocutory appeals; nothing short of an express amendment of that statute, it is argued, should be permitted to modify that construction. Since other circuits have accepted these arguments,[8] we have considered them with care.

First, we note that the Expediting Act is just another statute. It has been on the books a long time and it deals with important litigation. But the statute itself commands no special respect today. It has been criticized by Supreme Court Justices [9] and other scholars,[10] and narrowly construed to permit a court of ap-

peals to participate in appellate review of at least one civil antitrust case in which the Government was a party.[11] We do not consider our appraisal of the question presented here as an intrusion on hallowed ground.

Second, we note the significant difference between this question and the issues raised by attempts to appeal from orders granting or denying preliminary injunctions pursuant to § 1292(a) of the Judicial Code. That section has a dramatically different history, as well as a significant difference in its language, from § 1292(b). That long history was thoughtfully and thoroughly reviewed by the First Circuit in United States v. Cities Service Co., 410 F.2d 662 (1969), and by the Third Circuit in United States v. Ingersoll-Rand Co., 320 F.2d 509 (1963); see also the opinion of Mr. Justice Goldberg in chambers in United States v. F. M. C. Corp., 84 S.Ct. 4, 11 L.Ed.2d 20 (1963).

It is sufficient to note that the enactment of the Expediting Act in 1903 was a chapter in that history which had commenced earlier, and that the enactment of § 1292(a) in 1948 was merely intended to codify preexisting law. As Judge Coffin described it, § 1292(a) was

risdiction and entered an order accordingly. Had this legislation been in effect at that time, the district judge could have stated in writing his opinion that the motion was controlling and the defendant could thereupon have made application to the court of appeals for a review of the order denying the motion." 1958 U.S.Code Cong. & Adm.News at 5256.

8. Farbenfabriken Bayer A. G. v. United States, 1968 Trade Cases ¶ 72,570 (D.C. Cir.), cert. denied 393 U.S. 959, 89 S. Ct. 397, 21 L.Ed.2d 373; Tidewater Oil Co. v. United States, Misc. No. 9751 (9th Cir. July 28, 1971), cert. denied 404 U.S. 941, 92 S.Ct. 280, 30 L.Ed.2d 254.

9. "Whatever may have been the wisdom of the Expediting Act in providing direct appeals in antitrust cases at the time of its enactment in 1903, time has proven it unsatisfactory. See, e. g., Gesell, A Much Needed Reform—Repeal

the Expediting Act for Antitrust Cases, in 1961 N.Y. State Bar Assn. Antitrust L.Sym. 98 (CCH). Direct appeals not only place a great burden on the Court but also deprive us of the valuable assistance of the Courts of Appeals." United States v. Singer Mfg. Co., 374 U.S. 174, 175 n. 1, 83 S.Ct. 1773, 1774, 10 L.Ed.2d 823.

See also Brown Shoe Co. v. United States, 370 U.S. 294, 355, 82 S.Ct. 1502, 8 L.Ed.2d 510 (Mr. Justice Clark concurring); 370 U.S. at 364–365, 82 S.Ct. at 1546–1547 (Mr. Justice Harlan dissenting in part).

10. See Comment, Direct Appeals in Antitrust Cases, 81 Harv.L.Rev. 1558 (1968); Comment, Proposed Amendment to Expediting Act Would Eliminate Direct Appeal to the Supreme Court, 39 N.Y.U.L. Rev. 319 (1964).

11. Shenandoah Valley Broadcasting, Inc. v. ASCAP, 375 U.S. 39, 84 S.Ct. 8, 11 L.Ed.2d 8.

a "palimpsest," 410 F.2d at 665. On the other hand, § 1292(b) was a brand new statute written in 1958 on a totally clean slate. Moreover, the text of § 1292(a) contains an exception "where a direct review may be had in the Supreme Court" which arguably was intended to encompass all litigation covered by the Expediting Act. There is no comparable exception in § 1292(b). We do not consider the cases construing § 1292(a) applicable to § 1292(b).[12]

The case which provides the Government with its strongest support is United States v. California Co-op Canneries, 279 U.S. 553, 49 S.Ct. 423, 73 L.Ed. 838. In that case the court of appeals for the District of Columbia had entertained an appeal from an order denying leave to intervene; the Supreme Court reversed, holding "that by reason of the Expediting Act the Court of Appeals was without jurisdiction of an appeal in a suit in equity under the Anti-Trust Act in which the United States is the complainant. . . ." 279 U.S. at 559, 49 S.Ct. at 425. Earlier in the opinion, Mr. Justice Brandeis noted that the Expediting Act limited the right of review to an appeal from a final decision and "precluded the possibility of an appeal to either court from an interlocutory decree." 279 U.S. at 558, 49 S.Ct. at 425. These comments are especially forceful because the Court found it unnecessary to consider the language of the statute which arguably sustained the jurisdiction of the court of appeals, but instead relied entirely on the effect of the Expediting Act.

Nevertheless, *California Canneries* must be considered in its context. In 1929, when that case was decided, the section of the District of Columbia Code which had been invoked to sustain

jurisdiction of an interlocutory appeal had no counterpart in the general statutes conferring jurisdiction on federal appellate courts in other circuits. It would have been most anomalous for Government antitrust litigation to follow one procedural route in the District of Columbia and a different route in the remainder of the country.

Moreover, as the history of § 1292(a) discloses, the enactment of the Expediting Act did eliminate the preexisting right to appellate review of certain interlocutory decrees. The statement to that effect in the Court's opinion cannot, therefore, be taken as an interpretation of the subsequently enacted statute, particularly since the 1958 statute is consistent with an expediting purpose, whereas the procedure condemned in *California Canneries* had a dilatory effect.

Finally, we reject the Government's argument that it would be anomalous for a court of appeals to pass on controlling questions of law in cases which are directly reviewable in the Supreme Court after the entry of final judgment. Whenever we consider a controlling question in any litigation, our views are subject to final revision by the Supreme Court. The practical objection to our exercise of § 1292(b) jurisdiction in cases covered by the Expediting Act is predicated not on the suggested anomaly, but rather on the risk that our participation in the appellate process might add to the burdens of the Supreme Court. This risk does exist because certain interlocutory orders would become final if reversed on appeal.[13] However, most interlocutory orders would remain interlocutory even if reversed,[14] and none

---

12. We also consider inapposite the dicta in Brown Shoe Co. v. United States, 370 U.S. 294, 304–305, 82 S.Ct. 1502, 8 L.Ed. 2d 510, which was directed merely to the issue of finality.

13. The order challenged here is an example. See United States v. Scophony Corp., 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091.

14. Hopefully, most reversals would merely require a district court to enter the form of order that should have been entered in the first instance. In such cases the desirability of postponing Supreme Court review of the issue until the entire litigation is completed is certainly outweighed by the desirability of protecting the litigant from the consequences of error. *Cf.* United States Alkali Ex-

would become final if affirmed. Moreover, the number of cases covered by the Expediting Act is small and the fact that we have power to hear appeals from interlocutory orders does not mean that we must exercise it without restraint. In balance, we are persuaded that the efficacious purpose of § 1292(b) to expedite the ultimate termination of protracted cases justifies its application in Government antitrust litigation as well as in other similarly complex matters.

We hold that we have jurisdiction of this appeal pursuant to 28 U.S.C. § 1292 (b).

## II.

■ Our conclusion that § 1292(b) is applicable to cases covered by the Expediting Act does not mean that our jurisdiction may be exercised routinely. In every application under § 1292(b) the appellant has the burden of persuading the court of appeals that exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.[15] Of paramount importance is the requirement that immediate review will "materially advance the ultimate termination of the litigation." This requirement is of special importance in Expediting Act cases. The policy of that statute dictates prompt action at every stage of a case raising issues of

public importance. Moreover, since a court of appeals is not a normal participant in the reviewing process, special care must be taken to avoid the risk that a § 1292 appeal may actually impede rather than expedite, the conclusion of the entire case.[16]

■ We are persuaded that it is appropriate to exercise our jurisdiction in this case for four reasons. First, having heard argument on the threshold issue, we have necessarily made some study of the record and the question arising under the Illinois statute, and are prepared to decide it forthwith. Second, if the district court's order is erroneous, the interests of justice, as well as the desirability of concluding the litigation against petitioners promptly, strongly favor immediate review. Indeed, the posture of the issue is such that an application for an extraordinary writ might receive serious consideration from the Supreme Court. *Cf.* United States, Alkali Export Ass'n v. United States, 325 U.S. 196, 201–204, 65 S.Ct. 1120, 89 L.Ed. 1554; De Beers Consolidated Mines Ltd. v. United States, 325 U.S. 212, 217, 65 S.Ct. 1130, 89 L.Ed. 1566. Third, the question which is presented arises under an Illinois statute. On questions of state law, the Supreme Court has repeatedly indicated the desirability of having the benefit of consideration by court of appeals judges who are frequently required to dispose of state law issues in their respective juris-

port Ass'n v. United States, 325 U.S. 196, 201–204, 65 S.Ct. 1120, 89 L.Ed. 1554.

15. See Forgay v. Conrad, 47 U.S. 201, 205, 12 L.Ed. 404; Cobbledick v. United States, 309 U.S. 323, 324–325, 60 S.Ct. 540, 84 L.Ed. 783.

"The granting of the appeal is also discretionary with the court of appeals which may refuse to entertain such an appeal in much the same manner that the Supreme Court today refuses to entertain applications for writs of certiorari.

"It should be made clear that if application for an appeal from an interlocutory order is filed with the court of appeals, the court of appeals may deny such application without specify-

ing the grounds upon which such a denial is based. It could be based upon a view that the question involved was not a controlling issue. It could be denied on the basis that the docket of the circuit court of appeals was such that the appeal could not be entertained for too long a period of time. But, whatever the reason, the ultimate determination concerning the right of appeal is within the discretion of the judges of the appropriate circuit court of appeals." S.Rep. No. 2434, 85th Cong.2d Sess. 3, 4, 1958 U.S.Code Cong. & Adm.News, p. 5255.

16. For this reason a stay of proceedings in the district court pending an appeal to this court will seldom, if ever, be appropriate.

dictions.[17] And, finally, the record developed in the district court to support the motion to quash sufficiently parallels the record in Grobark v. Addo Machine Co., 16 Ill.2d 426, 158 N.E.2d 73 (1959), to indicate a strong likelihood that petitioner's position is sound.

We have, therefore, decided to grant the petition for leave to appeal pursuant to § 1292(b). We now consider the merits of the appeal.

### III.

Appellants raise no question about the form of the process, the manner in which it was served, the adequacy of notice, or venue. There are some differences between the two appellants,[18] but since they broadly contend that neither is subject to federal jurisdiction in Illinois, they place no emphasis on such differences.

The two companies are parts of one economic enterprise. They have no office or property in Illinois. Their manufacturing is performed in Great Britain and title to the iron dextran sold to their American customers passes before the product leaves the shores of England. The American distributors are substantial concerns in their own right; each handles many other products and presumably has the financial strength to respond to any claims from their respective customers.

The visits to Illinois by officers of appellants, or their predecessors, have been minimal, primarily relating to the conduct of certain patent litigation in Philadelphia. The facts concerning these visits were developed at length in discovery, but we agree with appellants that it would be somewhat artificial to use these sporadic visits to measure the signifi-

cance of their contacts with Illinois. We also agree with appellants that similarities between this record and the facts of Grobark v. Addo Machine Co., 16 Ill.2d 426, 158 N.E.2d 73 (1959) necessitate a careful consideration of that case.

There, as here, plaintiffs relied on § 17(1) (a) of the Illinois Civil Practice Act. Grobark was an exclusive distributor of adding machines purchased in New York from Addo and resold in Illinois. The distributorship was terminated and Grobark brought suit in the Circuit Court of Cook County. The Illinois Supreme Court concluded that Grobark and his son were not agents of Addo.

"They were independent businessmen in Illinois selling their own merchandise which had been manufactured by the defendant. They were not transacting business for the defendant in Illinois; they were transacting business for themselves. * * *

"As recently announced by the United States Supreme Court in the Hanson case [Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283], there are still territorial limitations to a State's *in personam* jurisdiction. Since Addo did not have 'minimum contacts' with the State of Illinois we are of the opinion that Addo did not submit to the jurisdiction of the Illinois courts." 158 N.E.2d at 79.

We have concluded that *Grobark* is not controlling here for two reasons, one factual and one legal. The significance of the factual distinction will be apparent if we first place the majority opinion in *Grobark* in proper legal context.

■ Justice Davis, joined by Justice Schaefer, filed a lucid dissenting opinion, pointing out that the Court's holding did

---

17. Huddleston v. Dwyer, 322 U.S. 232, 237, 64 S.Ct. 1015, 88 L.Ed. 1246.

18. Benger Labs, a wholly owned subsidiary of Fisons Limited, had negotiated the agreements involved. In 1964 Fisons Pharmaceuticals was formed as a wholly owned subsidiary of Fisons Limited. Benger Labs, though remaining in existence as a subsidiary of Pharmaceuticals, transferred the iron dextran patent and

the rights and obligations under the license agreements to Pharmaceuticals. Representatives of Pharmaceuticals visited Illinois on matters of patent litigation in the third circuit and a few other incidental matters. Representatives of Fisons Limited visited Illinois to discuss an incentive proposal relating to a quantity discount and to discuss a marketing survey.

not rest on a construction of the Illinois statute, but rather on the majority's interpretation of the Fourteenth Amendment to the Federal Constitution.[19] Since we are not bound by a state court's answer to a federal question, it is entirely appropriate for us to state our agreement with the dissenting Justices' analysis of federal law as applied to the *Grobark* facts.

■■■ As they pointed out, prior to *Grobark* the Illinois Supreme Court had squarely held that §§ 16 and 17 of the Illinois Civil Practice Act reflected a conscious purpose to assert jurisdiction over nonresident defendants to the extent permitted by the due process clause. Nelson v. Miller, 11 Ill.2d 378, 143 N.E.2d 673, 679 (1957). Their view was supported by learned comment on the statute both prior[20] and subsequent[21] to *Grobark*, by the majority in *Grobark* itself,[22] and has been reaffirmed in more recent decisions.[23] Thus, it is fair to state that the scope of the Illinois statute is measured by federal standards.

Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, on which the *Grobark* majority relied, does reaffirm the constitutional requirement that a nonresident must have certain qualifying contacts with the forum state to be subject to its *in personam* jurisdiction. Moreover, the holding of that case requires us to focus attention on the nonresident rather than simply the unilateral activities of a resident seeking to assert jurisdiction over a foreign defendant.

"The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. International Shoe Co. v. Washington, 326 U.S. 310, 319 [66 S.Ct. 154, 159, 90 L.Ed. 95]." 357 U.S. at 253, 78 S.Ct. at 1239.

■■■ Under the rule as stated in *Hanson*, we believe the record discloses a sufficient relationship between appellants and the transaction of business in Illinois to subject them to federal jurisdiction in the court below. We believe they have purposefully availed themselves of the benefits and protections of local law and commerce, and that their contracts have significantly affected the way in which business is conducted in Illinois.

Appellants are not simply foreign manufacturers whose products are resold in

---

19. "The opinion finds that the due process clause of the Fourteenth amendment to the United States constitution prohibits the exercise of jurisdiction by the Illinois courts in this case. I do not agree." 158 N.E.2d at 80. We note that the analysis in Chief Justice Daily's majority opinion rested entirely on federal precedent. He did not purport to depart from the basic holding of Nelson v. Miller, 11 Ill.2d 378, 143 N.E.2d 673 (1957), discussed in the text at n. 20, *infra*.

20. Justice Davis made reference to the following: Cleary and Seder, Extended Jurisdictional Bases for Illinois Courts, 50 N.U.L.R. 599; Joint Committee Comments, Smith-Hurd Anno.Stat., chap. 110, par. 17, p. 164; Jenner and Tone, Historical and Practice Notes, Smith-Hurd Anno.Stat., chap. 110, par. 17, p. 165;

Expanded Concepts of State Jurisdiction over Non-residents, O'Connor & Goff, 31 Notre Dame Lawyer, 223. See 158 N.E.2d at 81.

21. See Royce and Mason, Nonresident Jurisdiction in Business Litigation, Part 1, Chicago Bar Record, Vol. 53, p. 100 (1971).

22. 158 N.E.2d at 76.

23. Coplin v. Thomas, Haab and Botts, 73 Ill.App.2d 242, 219 N.E.2d 646 (1st Dist. 1966); Ziegler v. Houghton-Mifflin Co., 80 Ill.App.2d 210, 224 N.E.2d 12 (2d Dist. 1967); see O'Hare International Bank v. Hampton, 437 F.2d 1173, 1176 (7th Cir. 1971). See also Gray v. American Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961), a tort case making the same point.

the forum, or foreign patentees whose licensees are free to distribute a patented product locally on such terms as may be advantageous to themselves in the local market. The contractual relationships embody elements of control which the *Grobark* majority found significantly absent in that case.[24]

Appellants have, of course, obtained the benefit and protection of our patent laws.[25] The principal place of business of one of its licensees is located in Illinois. That licensee is also, by reason of a contract separate from though related to the license agreement an important distributor of iron dextran manufactured by appellants. Although the licensee-distributor is not a common law agent, its home offices in Illinois provide appellants with a significant practical contact with the forum state.[26] If there is a location in the United States where appellants' relationship to American commerce makes it appropriate to sustain jurisdiction over them, Illinois may, therefore, be the least objectionable forum. *Cf.* United States v. Scophony Corp., 333 U.S. 795, 817, 68 S.Ct. 855, 866, 92 L.Ed. 1091.[27]

Sales of iron dextran in Illinois generate both profits and royalties for appellants. The patent license agreement (and the supply agreement which incorporates the restrictions of the license agreement) contains provisions which control aspects of the business activities of the American licensee.[28] Thus, some, if not all, of the principal's economic

24. The majority opinion there stated that the defendant "did not at any time have the right to exercise any control over the distributors; . . ." 158 N.E.2d at 79.

25. The patent on iron dextran, U.S. Letters Patent No. 2,820,740, was originally issued on January 21, 1958, and subsequently reissued on April 28, 1959. "They should not be in the position, even though indirectly, to enjoy the fruit but to disavow the situs of the tree from which the fruit was derived." O'Hare International Bank v. Hampton, 437 F.2d 1173, 1177 (7th Cir. 1971).

26. "The test of whether business was transacted within the state must be applied in the context, not of communication and transportation criteria of yesteryears, but of modern day commercial and personal accelerated relationships. The long arm statutes are comrades of the computer." O'Hare International Bank v. Hampton, 437 F.2d 1173, 1177 (7th Cir. 1971).

27. It is possible that the real issue is whether it is fairer to make appellants come to Chicago to defend their use of an American patent than to allow them a measure of immunity from attack under the Sherman Act. Judge Hand's comment is relevant:

"In the end there is nothing more to be said than that all the defendant's local activities, taken together, do not make it reasonable to impose such a burden upon it. It is fairer that the plaintiffs should go to Boston than that the defendant should come here."

Hutchinson v. Chase & Gilbert, Inc., 45 F.2d 139, 142 (2d Cir. 1930). The existence of the patent avoids the problem of "power" to enforce a judgment against a person otherwise beyond the reach of the Full Faith and Credit clause. See Michigan Trust Co. v. Ferry, 228 U.S. 346, 353, 33 S.Ct. 550, 57 L.Ed. 867.

28. The license agreement with Armour provides in part that (1) the licensee is limited to manufacture, sale, and use for veterinary purposes only; (2) the licensor is to supply promotional literature for use by the licensee; (3) both parties must keep each other informed of their respective research, trade and secret processes, working details, etc.; (4) the licensee must supply samples of its manufactured product to the licensor and withdraw such product if it does not meet the licensor's standards; (5) the licensee cannot use the licensor's trademark and must, after termination of the agreement, assign whatever trademark it does use to the licensor; (6) labeling requirements are imposed on the licensee such that no indication may be given of a possible use of the product other than veterinary use; (7) Illinois law applies and the parties agree to submit certain disputes to a member of the Illinois Bar for resolution. The supply agreement incorporates the restrictions and controls of the license agreement.

We, of course, imply nothing whatever as to the propriety of these provisions as a matter of substantive, in this case antitrust, law. We merely hold that the licensor by the agreement has sufficient

control over an agent is continuously exercised by appellants over their American representatives. Their continuing relationship, including a significant measure of control over business activities within Illinois, is in our view, sufficient to sustain jurisdiction. See McGee v. International Life Insurance Co., 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223; Lurie v. Rupe, 51 Ill.App. 2d 164, 201 N.E.2d 158 (1st Dist. 1964).[29]

The order entered by the district court on August 27, 1971, is affirmed.

---

control over the business of an Illinois based corporation to provide the minimum contacts with the State of Illinois required under the Illinois long arm statute.

In United States v. Scophony Corp., the Supreme Court stated:

"We need not decide whether, in view of the agreements' continuing and pervasive effects, they could be considered as sufficing in themselves to make Scophony 'found' within the New York

district." 333 U.S. 795, 814, 68 S.Ct. 855, 865, 92 L.Ed. 1091.

29. "Traditional notions of fair play and substantial justice is the essence of due process in the area of jurisdiction over non-resident defendants and it is no violation of such notions to provide that this case be tried in the Courts of Illinois." Ziegler v. Houghton-Mifflin Co., 80 Ill.App.2d 210, 224 N.E.2d 12, 16 (2d Dist. 1967).